UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DENTON MURPHY,

                Plaintiff,        Civil Action No. 13-11795
                                     Honorable Robert H. Cleland
                                     Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [15, 18]

Plaintiff Denton Murphy ("Murphy") brings this action pursuant to 42 U.S.C. §405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [15, 18], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

### I.     RECOMMENDATION

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Murphy is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [18] be GRANTED, Murphy's Motion for Summary Judgment [15] be DENIED, and that, pursuant to sentence four of 42 U.S.C. §405(g), the Commissioner's decision be AFFIRMED.

## II.   REPORT

### A.   Procedural History

On December 6, 2010, Murphy filed applications for DIB and SSI, alleging disability beginning on November 10, 2008. (Tr. 125-37). His claims were initially denied on March 7, 2011. (Tr. 79-86). Thereafter, Murphy filed a timely request for an administrative hearing, which was held on October 26, 2011, before ALJ Ronald Herman. (Tr. 25-56). Murphy (represented by attorney John Brissette) testified at the hearing, as did his father, Don Murphy, and vocational expert Michelle Ross. (*Id.*). On November 7, 2011, the ALJ issued a written decision finding that Murphy is not disabled. (Tr. 11-21). On March 28, 2013, the Appeals Council denied review. (Tr. 1-5). Murphy filed for judicial review of the final decision on April 22, 2013. (Doc. #1).

### B.   Background

#### *1.   Disability Reports*

In a December 6, 2010 disability report, Murphy indicated that his ability to work is limited by a closed head injury (which he suffered in a car accident) and depression. (Tr. 164). He reported that he stopped working on November 10, 2008, because of his conditions, and because he was fired for "putt[ing] grease in the wrong bucket." (*Id.*). Murphy completed high school but had no further education. (Tr. 165). In Murphy's words:

> I have lost all my school friends because of my head injury. I do and or say things without thinking. I become very frustrated very easily. The two jobs I did good at was because my brother worked there also. He helped me even when the managers wanted to let me go. (Tr. 171).

In a January 1, 2011 function report, Murphy reported that he lives in house with his parents. (Tr. 173). When asked how his conditions limit his ability to work, Murphy indicated that he has short-term memory problems and has difficulty thinking, and he gets frustrated very

2

easily. (*Id.*). Murphy has no difficulty with personal care. (Tr. 175). He is able to prepare his own meals (frozen pizzas, chicken nuggets, French fries, and cereal), perform household chores (such as mowing the lawn, raking leaves, washing dishes, and vacuuming), and go grocery shopping with his father. (Tr. 175-76). He is able to drive, pay bills, and count change.[1] (Tr. 176). His hobbies include watching television, fishing, and biking. (Tr. 177). Murphy indicated that he becomes loud and angry when he is frustrated and said he prefers to be alone. (Tr. 178).

When asked to identify functions that are impacted by his conditions, Murphy checked talking, memory, completing tasks, concentration, understanding, following instructions, and getting along with others. (Tr. 178). He can pay attention for only five or ten minutes, and does not finish what he starts. (*Id.*). At times, he can follow written instructions (such as a recipe), but he does not follow spoken instructions well. (*Id.*). He does not handle stress or changes in routine well and has been fired for yelling at a co-worker. (Tr. 179).

### 2. *Hearing Testimony*

At the October 26, 2011 hearing before the ALJ, Murphy was thirty-eight years old and was living with his parents. (Tr. 28, 31). He testified that he was in a car accident in 1989 and has had memory problems since that time, which cause him to feel very frustrated. (Tr. 29-30, 34-35). Murphy further testified that, on a typical day, he fixes breakfast for his twelve-year-old nephew, gets him off to school, and does some yard work for a neighbor. (Tr. 31-32). He is easily distracted, however, and not always able to finish what he starts.[2] (Tr. 36).

Murphy also testified that, although he usually gets along well with others, he has

---

[1] In a third party function report dated January 1, 2011, Murphy's father, Don Murphy, generally corroborated Murphy's statements. (Tr. 185-92). However, Murphy's father indicated that Murphy sometimes needs reminders to do his laundry and cannot manage money. (Tr. 187-88).

[2] Murphy's father, Don Murphy, also testified at the hearing. (Tr. 47-50). He indicated that Murphy requires frequent reminders to complete tasks such as taking out the garbage and performing yard work, and it often takes him several attempts to complete a task properly. (*Id.*).

3

become overwhelmed and frustrated when working in the past, causing him – at least once – to walk off the job. (Tr. 37-38). At two of his jobs, where he was a grocery store bagger, he worked with his brother, who would intervene on Murphy's behalf when he became frustrated.[3] (Tr. 39). And, in jobs where his supervisor had given him a list of tasks to be accomplished in a day, he was known to set the list down somewhere and then forget where he put it. (Tr. 40). Murphy is able to drive, but he describes himself as a "homebody," saying that he does not go out socially or keep in touch with any friends. (Tr. 32-33).

        3.     *Medical Evidence*

        *(a)*     *Treating Sources*

The medical evidence indicates that Murphy received therapy services at Behavioral Medical Associates from April 2011 to September 2011. (Tr. 267-79). At his initial evaluation on April 27, 2011, Murphy reported that he had been "unable to sustain employment for any length of time." (Tr. 274). On mental status examination, Murphy's judgment was fair. (Tr. 275). He was diagnosed with a mood disorder due to a traumatic brain injury with depressive features. (*Id.*). On May 5, 2011, Murphy displayed some "social inappropriateness" and did not pick up on social cues. (Tr. 273). On June 8, 2011, Murphy was noted to have some difficulty staying on topic and poor social skills. (Tr. 271). On July 11, 2011, Murphy reported being "easily distracted," but his behavior was normal and his thinking was appropriate. (Tr. 270).

        *(b)*     *Consultative and Non-Examining Sources*

On February 3, 2011, Murphy saw Jennifer Lombardo, Ph.D., for a consultative psychological examination. (Tr. 245-50). Murphy reported that he was in a car accident in 1989, where he sustained a closed head injury. (Tr. 245). He was hospitalized following the

---

[3] Indeed, the record contains a September 11, 2011 letter from Murphy's brother, Derrick Murphy, in which he explained the ways he shielded his brother from difficult customers or managers. (Tr. 232-33).

accident, was in a coma for one and a half weeks, and has experienced memory problems since that time. (Tr. 245-46). He reported having difficulty multitasking, but said he is "able to do single tasks at a time." (Tr. 245). Murphy indicated that he worked at a grocery store with his brother for five years but had difficulty when he was required to do something new. (Tr. 246). Murphy denied having close friends, saying that he prefers to be alone, and described his current goal as "to get disability." (Tr. 247). Dr. Lombardo noted that Murphy's dress was appropriate, grooming and hygiene were good, and his eye contact was appropriate. (*Id.*). She also noted that Murphy's judgment was generally intact, although his judgment appeared impaired with regard to managing money. (*Id.*). Murphy reported struggling with anger and frustration, saying that he becomes angry with himself (but not others) daily. (Tr. 248). Dr. Lombardo noted that Murphy's performance on the mental status examination supported some deficits in memory functioning, particularly his working memory, but he was able to perform serial 7s and simple calculations. (Tr. 248-49). Dr. Lombardo further opined as follows:

> [Murphy] should be able to understand simple instructions but may struggle to remember and carry them out. He may become distracted or overwhelmed by other things in his environment, causing him to perform tasks incorrectly or to not complete tasks. Available information suggests that [Murphy] does poorly with change. If his job tasks remain[] repetitive with no added duties, he may do well, but any type of change may impair his functioning. [Murphy's] ability to perform job tasks adequately may also be impaired by irritability and anger, both with himself and others. His work history suggests that he struggles to interact well with others and he may react poorly to feedback from supervisors. [Murphy] would perform best in a highly structured environment requiring few, if any, work-related decisions, little change or interpersonal interactions in the environment, and where his execution of his job duties was frequently monitored.

(Tr. 249-50). Dr. Lombardo diagnosed Murphy with cognitive disorder and dysthymic disorder, assigned him a Global Assessment of Functioning ("GAF")[4] score of 50, and characterized his

---

[4] GAF examinations measure psychological, social, and occupational functioning on a

5

prognosis as poor, saying his "cognitive function is unlikely to improve." (Tr. 250).

On February 16, 2011, Murphy saw Dr. Scott Lazzara for a consultative physical examination. (Tr. 252-58). Dr. Lazzara noted that Murphy denied any problems sitting, standing, walking, or lifting. (Tr. 254). On examination, Murphy's memory was intact with normal concentration, and his insight and judgment were appropriate. (Tr. 255). Dr. Lazzara noted that Murphy had no difficulty with any orthopedic maneuvers and had full range of motion. (Tr. 255-57). In conclusion, Dr. Lazzara indicated that Murphy's overall degree of physical impairment was "minimal to mild." (Tr. 257). He characterized Murphy's prognosis as "fair to good," depending on the results of a psychological evaluation. (*Id.*).

On, February 14, 2011, Bruce Douglass, Ph.D., reviewed Murphy's records and completed a Mental Residual Functional Capacity ("RFC") Assessment and a Psychiatric Review Technique. (Tr. 61-64). Dr. Douglass noted that Murphy suffers from an organic mental disorder (as defined in Listing 12.02) and an affective disorder (as defined in Listing 12.04). (Tr. 61). Dr. Douglass opined that Murphy is mildly limited in his activities of daily living, and moderately limited in both social functioning and maintaining concentration, persistence, and pace.[5] (*Id.*). Dr. Douglass indicated that Murphy's "[c]oncentration will be

---

continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

[5] Specifically, in his RFC Assessment, Dr. Douglass opined that Murphy is not significantly limited in the ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; and maintain socially appropriate behavior. (Tr. 63-64). Dr. Douglass further opined that Murphy is moderately limited in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule and maintain regular attendance; work in coordination with or proximity to others without being distracted by them; complete a normal workday and work week without interruptions from psychological symptoms; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors. (*Id.*).

6

limiting in demanding work settings, and he will have trouble keeping up with complex or technical tasks." (Tr. 64). In conclusion, Dr. Douglass indicated that Murphy can perform routine, two-step tasks on a sustained basis, but "will not work well with the public." (Tr. 64).

    *4.    Vocational Expert's Testimony*

Michelle Ross testified as an independent vocational expert ("VE"). (Tr. 50-55). The VE characterized Murphy's past relevant work as unskilled in nature and medium in exertion. (Tr. 51-52). The ALJ asked the VE to imagine a claimant of Murphy's age, education, and work experience, who could perform work at all exertional levels, but with the following non-exertional limitations:

> … due to cognitive deficits subsequent primarily from a closed head injury in the late 1980's the individual should perform work limited to simple, routine, and repetitive tasks in a work environment free of fast paced production requirements, which is defined as constant activity with work tasks performed sequentially in rapid succession, involving only simple work related decisions with few if any work place changes, and … he should also work in an environment where he only has occasional contact with the public, coworkers, and supervisors, particularly with regards to supervisors.

(Tr. 52). The VE testified that the hypothetical individual would not be capable of performing Murphy's past relevant work. (Tr. 52-53). However, the VE testified that the hypothetical individual would be capable of working in the positions of machine feeder (15,500 jobs in the state of Michigan), packager (7,200 jobs), and janitor (25,600 jobs). (*Id.*).

    **C.    Framework for Disability Determinations**

Under the Act, DIB and SSI are available only for those who have a "disability." *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A). The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps …. If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D. The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Murphy is not disabled under the Act. At Step One, the ALJ found that Murphy has not engaged in substantial gainful activity since November 10, 2008, the alleged onset date. (Tr. 13). At Step Two, the ALJ found that Murphy has the severe impairments of "cognitive impairment and memory loss." (Tr. 13-

14). At Step Three, the ALJ found that Murphy's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment. (Tr. 14-16).

The ALJ then assessed Murphy's residual functional capacity ("RFC"), concluding that he is capable of performing work at all exertional levels, with the following nonexertional limitations: he is limited to simple, routine, and repetitive tasks; he cannot work with fast-paced production requirements (defined as "constant activity with work tasks performed sequentially, in rapid succession"); he should be limited to only simple work-related decisions; he can have few (if any) workplace changes; he should be in a highly structured environment; and he can only have occasional contact with the public, coworkers, and supervisors. (Tr. 16-19). At Step Four, the ALJ determined that Murphy is unable to perform his past relevant work. (Tr. 19). At Step Five, the ALJ concluded, based in part on the VE's testimony, that Murphy is capable of performing a significant number of jobs in the national economy and, thus, he is not disabled under the Act. (Tr. 20-21).

E. **Standard of Review**

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal

quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole. *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

### F. Analysis

Murphy argues that the ALJ erred in failing to properly evaluate medical opinion evidence from two sources – Dr. Jennifer Lombardo (the consultative examining psychologist)

and Dr. Bruce Douglass (the state agency reviewing psychologist). (Doc. #15 at 8-13). Specifically, Murphy argues that the ALJ erred in failing to incorporate these opinions into his RFC assessment. (*Id.*). As discussed more fully below, these arguments lack merit.

The applicable regulations provide that all medical opinion evidence must be considered when determining a claimant's disability. *See* 20 C.F.R. §404.1527(b); *see also* 20 C.F.R. §416.927(b). Specifically, the regulations provide that, "Regardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. §404.1527(c); *see also* 20 C.F.R. §416.927(c). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. §404.1527(a)(2); *see also* 20 C.F.R. §416.927(a)(2). In other words, "[a] medical source statement about what an individual can still do is medical opinion evidence that an adjudicator must consider together with all of the other relevant evidence (including other medical source statements that may be in the case record) when assessing an individual's RFC." *Soc. Sec. Rul.* 96-5p, 1996 WL 374183, at *5 (July 2, 1996).

Murphy first asserts that the ALJ erred in evaluating the opinion of Dr. Lombardo, who performed a consultative examination of him. (Doc. #15 at 9-11). As set forth above, the ALJ discussed Dr. Lombardo's examination findings and opinions in great detail. (Tr. 17-18). Specifically, the ALJ noted that Dr. Lombardo diagnosed Murphy with cognitive disorder, not otherwise specified, and dysthymic disorder, and assigned him a GAF score of 50. (Tr. 18 (citing Tr. 250)). She opined that Murphy is able to understand simple instructions, but may struggle to remember and carry them out. (Tr. 18 (citing Tr. 249)). She further noted that

Murphy might become distracted or overwhelmed by other things in his environment, causing him to perform tasks incompletely or to not complete tasks. (Tr. 18 (citing Tr. 249)). The ALJ also noted Dr. Lombardo's opinion that if Murphy's job tasks remain repetitive with no additional duties, he may do well, but she believed that any type of change might impair his functioning. (Tr. 18 (citing Tr. 250)). She further found that Murphy's ability to perform job tasks adequately might also be impaired by irritability and anger, both with himself and others, and she noted that Murphy's work history suggests that he struggles to interact with others and might react poorly to feedback from supervisors. (*Id.*). The ALJ specifically noted that, ultimately, Dr. Lombardo concluded that Murphy "would perform best in a highly structured environment requiring few, if any, work-related decisions, little change or interpersonal interactions in the environment, and where his execution of his job duties was frequently monitored." (*Id.*).

After thoroughly discussing Dr. Lombardo's opinion, the ALJ indicated that he gave it "some weight … to the extent it is consistent with the medical record …."[6] (Tr. 18). Murphy argues that this is merely a "conclusory statement that fails to engage in the specifics of Dr. Lombardo's opinion" and fails to explain to the reviewer why the ALJ chose "to omit most of Dr. Lombardo's conclusions from the RFC." (Doc. #15 at 10-11).

Comparison of the ALJ's RFC assessment with Dr. Lombardo's opinion, however, reveals that the ALJ adopted Dr. Lombardo's opinion almost in its entirety. Consistent with – and taken nearly verbatim from – Dr. Lombardo's opinion, the ALJ found that Murphy should

---

[6] The ALJ also indicated that he gave "little weight to the GAF score assigned by Dr. Lombardo, as it is inconsistent with the medical evidence of record and demonstrates how the claimant was functioning at a specific point in time and should not be construed as a longitudinal picture of his overall mental functioning." (Tr. 18). Murphy does not appear to challenge the ALJ's decision in this respect, indicating that the ALJ "provided a thorough explanation of how it considered Dr. Lombardo's GAF assignment …." (Doc. #15 at 11).

work "in a highly structured environment" (*compare with* Dr. Lombardo's opinion that Murphy "would perform best in a highly structured environment"). (Tr. 16, 250). The ALJ further found that Murphy should be limited to only "simple work-related decisions" and "have few, if any, work place changes" (*compare with* Dr. Lombardo's opinion that Murphy should be required to make "few, if any, work-related decisions" and should have "little change"). (*Id.*). And, finally, the ALJ found that Murphy should be limited to "only [] occasional contact with the public, coworkers, and supervisors" (*compare with* Dr. Lombardo's opinion that Murphy should have little "interpersonal interaction[]"). (*Id.*). Therefore, contrary to Murphy's contentions, the ALJ did incorporate Dr. Lombardo's limitations into the RFC assessment. Indeed, the ALJ's RFC assessment is even more restrictive than Dr. Lombardo's opinion in two respects: he limited Murphy to simple, routine, and repetitive tasks, and he found that Murphy cannot work with fast-paced production requirements. (Tr. 16).

Murphy appears to argue that the ALJ should have included additional limitations in the RFC assessment, based on opinions articulated by Dr. Lombardo that preceded her conclusion. (Doc. #15 at 9-10; Doc. #19 at 2-3). Specifically, Murphy points to Dr. Lombardo's statements that he (1) may struggle to remember and carry out simple instructions; (2) may become distracted or overwhelmed by other things in the environment, causing him to perform tasks incorrectly or to not complete tasks; (3) may be impaired by irritability in performing job tasks adequately; and (4) may struggle to interact well with others and may react poorly to feedback. (*Id.*). Murphy asserts that it is "unclear from the Decision why the ALJ failed to incorporate these limitations" (Doc. #15 at 11), but – even assuming this assertion to be true – Murphy has not explained how these statements require a more restrictive RFC assessment than the one the ALJ imposed.

Moreover, it appears that Dr. Lombardo's conclusory sentence, in which she opines that Murphy "would perform best in a highly structured environment requiring few, if any, work-related decisions, little change or interpersonal interactions in the environment, and where his execution of job duties was frequently monitored," incorporates and summarizes her other opinions about Murphy's ability to function in a work environment. (Tr. 249-50). For example, despite the fact that Dr. Lombardo opined that Murphy might struggle to remember and carry out simple instructions, and might become overwhelmed by other things in his environment, she believed he would be able to work in a highly structured environment requiring few (if any) work-related decisions. (*Id.*). Likewise, although Dr. Lombardo felt that Murphy might be impaired by irritability in performing job tasks adequately and might struggle to interact well with others, she believed he would be able to work in an environment where there were few interpersonal interactions. (*Id.*). As discussed above, the ALJ incorporated Dr. Lombardo's actual conclusions into his RFC assessment nearly verbatim. (Tr. 16, 249-50). Given the overall consistency of the ALJ's RFC assessment with Dr. Lombardo's opinion, the Court finds no error warranting remand.

Murphy also argues that the ALJ erred in purportedly ignoring the opinion of Dr. Douglass (the state agency reviewing psychologist), "failing even to mention its existence in the discussion and analysis of Plaintiff's RFC." (Doc. #15 at 11-12). Dr. Douglass opined that Murphy is moderately limited in both social functioning and maintaining concentration, persistence, or pace. (Tr. 61). However, Dr. Douglass further opined that Murphy was not significantly limited in his ability to "understand," "remember," and "carry out" "very short and simple instructions," and that he "retains the capacity to perform routine, 2-step tasks on a sustained basis." (Tr. 63-64).

Social Security Ruling 96-6p states that an ALJ must consider the findings made by State agency medical consultants regarding the nature and severity of an individual's impairments as expert opinion evidence of a non-examining source. *See Soc. Sec. Rul.* 96-6p, 1996 WL 374180, at *2 (July 2, 1996). While ALJs are not bound by the findings made by state agency physicians, "they may not ignore these opinions and must explain the weight given to the opinions in their decisions." *Id.* In this case, although the ALJ indicated vaguely that he considered opinion evidence in accordance with the requirements of Social Security Ruling 96-6p (Tr. 16), he did not specifically discuss Dr. Douglass' opinion.

While the ALJ should have discussed Dr. Douglass' opinion, the Court finds his failure to explicitly explain the weight given to this opinion was harmless error, as the ALJ's RFC assessment clearly is consistent with Dr. Douglass' opinion. Specifically, the ALJ's conclusion that Murphy retains the capacity to perform simple, routine, and repetitive tasks, free of fast-paced production requirements squares with Dr. Douglass' opinions that Murphy is not significantly limited in his ability to "understand," "remember," and "carry out" "very short and simple instructions," and that he can "perform routine, 2-step tasks on a sustained basis." (Tr. 16, 63-64). For these reasons, the ALJ's failure to discuss Dr. Douglass' opinion was harmless error. *See, e.g., Wafford v. Astrue*, 2008 WL 347688, at *3 (E.D. Ky. Feb. 6, 2008) (ALJ's failure to discuss state agency physician's opinion was harmless error where the RFC assessment was otherwise supported by substantial evidence); *Hardin v. Astrue*, 2011 WL 1630902, at *7 (N.D. Tex. Mar. 31, 2011) (same); *Mcanally v. Astrue*, 241 F. App'x 515, 519 (10th Cir. 2007).

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is correct and supported by substantial evidence.

### III.   CONCLUSION

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion

for Summary Judgment [18] be GRANTED, Murphy's Motion for Summary Judgment [15] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: April 30, 2014  s/David R. Grand
Ann Arbor, Michigan  DAVID R. GRAND
 United States Magistrate Judge

## REVIEW

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and Fed.R.Civ.P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation. *Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). A copy of any objection must be served upon this Magistrate Judge. E.D. Mich. LR 72.1(d)(2).

*Note these additional requirements at the direction of Judge Cleland:*

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains. Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc. The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.

16

## **CERTIFICATE OF SERVICE**

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on April 30, 2014.

                                                    s/Felicia M. Moses
                                                  FELICIA M. MOSES
                                                  Case Manager